IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **NICOLE MORRISON,** | ) CASE NO. 4:11CV3135 |
| Plaintiff, | ) |
| vs. | ) **MEMORANDUM** |
| | ) **AND ORDER** |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of the Social Security Administration,** | ) |
| Defendant. | ) |

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 401, *et seq.,* and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*

## PROCEDURAL BACKGROUND

The Plaintiff, Nicole Morrison, filed for disability and SSI benefits on July 7, 2008. (Tr. 156-63.) Morrison alleges that she has been disabled since December 1, 2007. (Tr. 156.) Her application was denied, and an administrative hearing was held before Administrative Law Judge ("ALJ") Michael Haubner on August 19, 2010. (Tr. 29-72.) On August 27, 2010, the ALJ issued a decision concluding that Morrison is not "disabled" within the meaning of the Act and therefore is not eligible for either disability or SSI benefits. (Tr. 17-23.) The ALJ determined that, although Morrison suffers from severe impairments and is unable to perform her past relevant work, she can perform other jobs. (Tr. 19-23.) On June 22, 2011, the Appeals Council denied Morrison's request for review. (Tr. 1-4.) Morrison now seeks judicial review of the ALJ's determination as the final

decision of the Defendant, the Commissioner of the Social Security Administration ("SSA"). (Filing No. 1.)

Morrison claims that the ALJ's decision is incorrect because the ALJ failed to: 1) consider the relapsing nature of multiple sclerosis, instead focusing on her periods of remission; 2) properly evaluate the opinion of nurse practitioner Mary Filipi, Ph.D., APRN; and 3) properly determine Morrison's depression as a severe impairment.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits should be reversed and remanded

## FACTUAL BACKGROUND

**Documentary Evidence**

On December 5, 2007, Thomas Werner, M.D., a physician at the Grand Island Clinic ("Clinic"), examined Morrison four days after her alleged disability began. (Tr. 272-74.) Dr. Werner noted Morrison's history of multiple sclerosis. Morrison reported increasing weakness in her legs and difficulty walking. (Tr. 272.) During the examination, Morrison walked with a limp. She exhibited normal memory, attention, concentration, and sensation. Dr. Werner diagnosed a multiple sclerosis flare, and he prescribed a steroid and other medications including an IV infusion drug. (Tr. 274.)

On December 31, 2007, Dr. Werner observed that Morrison had intact memory and normal attention, concentration, and sensation. Morrison had slightly reduced strength in her thigh, and continued to limp. Dr. Werner noted that Morrison's multiple sclerosis symptoms were "much better." Dr. Werner prescribed a neuropathic pain medication and a muscle relaxant. (Tr. 271.)

On January 22, 2008, Phillip Cahoy, M.D., an orthopedic specialist, examined Morrison's left wrist, which Morrison fractured two months earlier in a car accident. (Tr. 251.) X-rays showed that the fracture was completely healed. (Tr. 250.)

On February 13, 2008, Morrison saw Dr. Werner with complaints of ear pain and a cough. (Tr. 267.) She walked with a normal gait, and had normal sensation, coordination, attention, and concentration. Dr. Werner diagnosed sinusitis, and he prescribed an antibiotic and cough medicine. (Tr. 268.)

On February 27, 2008, Mary Filipi, Ph.D., APRN, examined Morrison at the Clinic. (Tr. 330-32.) Morrison complained of knee and back pain. (Tr. 330.) Dr. Filipi observed that Morrison had no gross cognitive deficits, good visual acuity, and had intact cranial nerves aside from mild left-eye nystagmus present since childhood. Morrison exhibited full overall strength, and she walked on her heels and toes and tandem walked without difficulty. (Tr. 331.) Dr. Filipi ordered cervical and thoracic MRI scans, which showed very mild spondylotic changes with a possible subtle cord lesion. (Tr. 334.) An MRI of Morrison's brain showed stable white matter lesions consistent with multiple sclerosis. (Tr. 333.)

On March 17, 2008, Morrison saw chiropractor R.L. Pomajzl, D.C., for lower back pain and related symptoms. (Tr. 385.) Dr. Pomajzl ordered X-rays, which showed moderate scoliosis and loss of cervical curvature. Dr. Pomajzl diagnosed several spinal problems, including thoracic and lumbar subluxation, low back pain, and sciatica. (Tr. 385.) Morrison continued to see Dr. Pomajzl regularly for chiropractic treatment. (Tr. 389-93, 460-62.)

On May 8, 2008, Morrison saw Dr. Werner for allergic rhinitis. (Tr. 264-65.) Dr. Werner prescribed medications, including steroid infusions. (Tr. 265, 335, 337.)

On May 23, 2008, Dr. Filipi wrote a letter stating that since 2002, Morrison experienced "bouts of optic neuritis with increasing fatigue." (Tr. 329.) Dr. Filipi also noted that Morrison had gait dysfunction and repeated Bells Palsy. Dr. Filipi noted the progressive nature of multiple sclerosis and stated she believed there would be "no significant improvement" in Morrison's condition. (Tr. 329.)

On July 14, 2008, Morrison went to the emergency room with dizziness, double and blurred vision, decreased control of her right eye, tingling on the right side of her head, and numbness on the right side of her mouth. A physician observed that Morrison had an abnormal gaze with lateral deviation in the right eye and paralysis of the left eye. (Tr. 363.) However, Morrison reported improved eye control following a steroid injection. The physician diagnosed acute multiple sclerosis exacerbation, intranuclear opthalmoplegia, and a urinary-tract infection. She prescribed antibiotics and four doses of IV Solu-Medrol, a drug used in the treatment of multiple sclerosis. (Tr. 364.)

On July 24, 2008, Morrison returned to the Clinic and was diagnosed with lower back pain. (Tr. 421.) During a July 30, 2008, visit Morrison told Dr. Filipi that she was "back to 95 percent" following her recent emergency room visit. Morrison exhibited no gross cognitive deficits, and she had intact visual fields and cranial nerves, aside from very mild nystagmus and slow pupillary response on the right side. (Tr. 466.) Morrison also had full strength, muted reflexes attributed to her steroid use, and she could walk on her heels and toes and tandem walk without difficulty. (Tr. 466–67.) Dr. Filipi diagnosed a multiple

sclerosis flare responsive to steroids, and a pseodo-flare secondary to Morrison's recent sinusitis and urinary tract infection. (Tr. 467.)

On August 28, 2008, Glen Knosp, M.D., a state Disability Determination Services (DDS) physician, completed a non-examining physical assessment. (Tr. 373–82.) Dr. Knosp opined that Morrison could lift up to twenty pounds occasionally and up to ten pounds frequently, and could sit, stand, or walk for up to six hours each in an eight-hour day. (Tr. 374.) He also indicated that Morrison could occasionally climb, balance, stoop, kneel, crouch, and crawl, but should avoid concentrated exposure to extreme temperatures and hazards. (Tr. 375, 377.) Dr. Knosp explained that Morrison worked part-time as a hair stylist, walked without an assistive device, and appeared unremarkable during physical examinations. (Tr. 381-82.) He also noted that Morrison was doing very well overall, aside from her only complaint of optic neuritis of the right eye. (Tr. 381.) He noted that her multiple sclerosis was stable. (Tr. 382.) On October 6, 2008, Jerry Reed, M.D., a second DDS physician, affirmed Dr. Knosp's assessment as written. (Tr. 394.)

On September 23 and 30, 2008, Morrison returned to the Clinic with sinus complaints. (Tr. 418, 420.) On October 1, 2008, she reported intermittent dizziness. An eye examination exhibited some nystagmus with a rightward gaze. Morrison was treated for sinusitis, and the doctor's notes questioned whether her symptoms were an early sign of exacerbation of her multiple sclerosis. (Tr. 416.)

On December 3, 2008, Morrison again saw Dr. Filipi. (Tr. 464–65.) Morrison's concern was the prevention of further urinary tract infections. Dr. Filipi noted that Morrison had good memory, no gross cognitive deficiencies, intact cranial nerves, and full overall body strength. (Tr. 464.) Morrison had diminished reflexes, but she showed good

coordination. (Tr. 464-65.) She could walk on her heels and toes and tandem walk without difficulty. Dr. Filipi prescribed antibiotics to aid in preventing urinary tract infections, and Morrison declined a urology referral. (Tr. 465.)

On December 22, 2008, Morrison returned to the Clinic with complaints of sinus congestion. She was diagnosed with sinusitis, and received antibiotics and cough medicine. On December 28, 2008, Morrison complained of "a little bit of a dizzy feeling" and a right lateral gaze. It was noted that these symptoms have occurred in the past prior to an multiple sclerosis exacerbation. (Tr. 412.) On January 13, 2009, Morrison complained of blurred vision and received another steroid injection. (Tr. 408-10.) The effects of long-term use of steroids were discussed. (Tr. 409.)

On March 6, 2009, Dr. Werner examined Morrison at the Clinic for ear pain. (Tr. 404-06.) Morrison's gait was normal, and she had normal sensation and coordination. (Tr. 404-05.) Her eyes appeared normal, and she demonstrated normal attention and concentration. Dr. Werner diagnosed Morrison with sinusitis. (Tr. 405.)

On March 18, 2009, Dr. Filipi wrote a letter to Morrison's attorney. In the letter, Dr. Filipi stated that Morrison experienced eye problems and urinary tract infections. She also remarked that Morrison remained "reasonably functional but does display some low level disability at all times." (Tr. 463.)

On April 2, 2009, Morrison complained to Dr. Filipi about numbness in her left hand and perineal area. Morrison claimed she was trying to maintain a full-time job as a beautician, but she kept dropping things. Morrison showed good recent and remote memory, no gross cognitive deficits, intact cranial nerves, full strength on her right side, and almost full strength on her left side. (Tr. 451.) Morrison had decreased reflexes, but

exhibited good coordination.  She could also walk on her heels and toes, but had difficulty with tandem walking.  Dr. Filipi diagnosed multiple sclerosis with a recent flare. (Tr. 452.) She ordered MRIs,[1] and prescribed a three-day course of steroid injections.  (Tr. 433-35, 452.)

On April 14, 2009, Morrison returned to the medical Clinic for urinalysis.  (Tr. 440.) She was diagnosed with a urinary tract infection and received antibiotics.  (Tr. 439.)  An April 20, 2009, MRI of Morrison's cervical spine showed "[s]ubtle vague scattered areas of increased signal" that were probably artifacts of testing.  (Tr. 448.)  An MRI of Morrison's brain completed on the same day showed a slight progression of hyperintensity adjacent to the posterior lateral aspect of the right ventricle, and otherwise stable hyperintensities. (Tr. 449.)

During a May 6, 2009 appointment, Dr. Filipi expressed concern that Morrison's disease was progressing.  (Tr. 447.) They discussed treatment options, and Morrison elected to proceed with Tysabri treatment.  (Tr. 447, 490.)

On May 14, 2009, Morrison returned to the Clinic for another steroid injection. During the visit she was diagnosed with allergic rhinitis.  (Tr. 438.)

In a June 25, 2009, letter to Morrison's attorney, Dr. Filipi noted that Morrison had a significant multiple sclerosis flare since her last letter dated March 18, 2009.  Dr. Filipi remarked that she was changing Morrison's medication treatment due to this rapid advancement in order to stall greater permanent disability.  Dr. Filipi also claimed that

---

[1] It was noted that arranging MRIs would take time, as Morrison was without insurance.

7

Morrison was "having greater difficulty performing functions that allowed her to maintain any type of employment." (Tr. 446.)

Morrison returned to the Clinic several times in June, July, and August 2009. Her diagnoses during this period included urinary tract infections, rhinitis, and neuralgia. (Tr. 498-503.)

On August 26, 2009, Morrison told Dr. Filipi that she was doing well on her Tysabri treatment, but she contracted a urinary tract infection following a recent injection. Dr. Filipi found that Morrison had good recent and remote memory, no cognitive deficits, intact cranial nerves, and full overall body strength. Morrison had diminished reflexes, but she could walk on her heels and toes and tandem walk without difficulty. (Tr. 506.) Dr. Filipi observed that coordination testing was "good without signs of ataxia." (Tr. 507.) She prescribed a course of antibiotics following each Tysabri infusion to aid in preventing further urinary tract infections. (Tr. 507.)

On September 14, 2009, Dr. Werner examined Morrison at the Clinic. (Tr. 495-97.) Morrison reported sinus problems, with ear and eye pain. (Tr. 495.) However, she walked with a normal gait and had normal sensation, coordination, attention, and concentration. (Tr. 495-96.) Dr. Werner diagnosed sinusitis and prescribed antibiotics. (Tr. 496.)

On November 6, 2009, Morrison saw Dr. Werner for a cough and dizziness. (Tr. 537.) Dr. Werner again noted that Morrison had normal sensation and coordination, intact memory, and normal attention and concentration. (Tr. 538.) Dr. Werner diagnosed influenza and prescribed flu medicine and cough syrup. (Tr. 538-39.)

On December 2, 2009, Morrison saw Dr. Filipi that she received a seventh Tysabri injection and felt she "ha[d] her life back." (Tr. 510.) Morrison reported no "full flares" and

no further urinary tract infections since she began Tysabri treatment. Morrison showed had no cognitive deficits, good recent and remote memory, intact cranial nerves, and full overall body strength. (Tr. 510.) She had diminished reflexes, but performed well during coordination testing, and could walk on her heels and toes and tandem walk without difficulty. (Tr. 510-11.) Dr. Filipi noted that Morrison's multiple sclerosis appeared stable with Tysabri treatment. (Tr. 511.)

On February 26, 2010, Morrison returned to the Clinic and was diagnosed with malaise and fatigue. (Tr. 533.) On March 9, 2010, she received treatment for allergic rhinitis. (Tr. 532.) On April 15, 2010, Morrison returned to the Clinic for ear pain. She was diagnosed with sinusitis, an ear infection, and impacted ear wax. Antibiotics were prescribed. (Tr. 529.)

On June 21, 2010, Morrison returned to Dr. Filipi. (Tr. 546-47.) Morrison reported no discreet flares or urinary-tract infections. Dr. Filipi found no gross cognitive deficits, intact cranial nerves, full upper body strength, "4/5" hip-flexor strength, reduced reflexes, and good coordination with no signs of ataxia. Morrison could walk on her heels and toes, but had a slight decrease in tandem walking. (Tr. 546.) Dr. Filipi noted that Morrison's multiple sclerosis appeared stable on her medication regimen. (Tr. 546-47.)

On July 30, 2010, Morrison returned to the Clinic for a steroid injection. (Tr. 528.) On August 4, 2010, she was diagnosed with sinusitis and received antibiotics. (Tr. 527.)

**Plaintiff's Testimony**

At the time of the hearing before the ALJ, Morrison was twenty-five years old. (Tr. 39.) Morrison attended college for two years and earned cosmetology and barber licenses. In 2006 and until September 2007, she had two part-time jobs, as a cosmetologist and a

gas station cashier. (Tr. 39-40.) She then worked only as a part-time cosmetologist. In 2008, she cut back on her hours "tremendously." (Tr. 40-41.) In 2009, she began working for herself to arrange her own schedule. (Tr. 64.) She last sought full-time work in January 2009. Morrison agreed with the ALJ's summary of her diagnoses: cervical spondylosis; moderate lumbar scoliosis; multiple sclerosis; status post motor vehicle accident with a left non-displaced distal radial fracture; morbid obesity[2]; migraines; depression; insomnia; ostopenia; sinusitis; Bells palsy; optic neuritis; neuralgia; allergic rhinitis; and hypertension. (Tr. 41.) She stated that she goes monthly to a hospital for an IV infusion of her multiple sclerosis medication. (Tr. 66.) She testified that she regularly experienced fatigue, the nerve damage to her right eye caused problems every day, she had problems with depth perception, her frequent urinary tract and sinus infections were due to her multiple sclerosis that caused them to flare, she had occasional migraines and frequent headaches, her hands shook, she experienced muscle spasms, nerve damage in her right foot caused problems, she still experienced problems from her left wrist fracture, and she experienced daily depression. (Tr. 66-71.) Morrison stated that no primary physician has referred her fo a psychologist or psychiatrist because she was taking Prozac, which helped her. (Tr. 71.)

Morrison testified that she could stand for thirty minutes, sit for one hour, and walk for one-half mile. (Tr. 42-43.) She stated that between 9:00 a.m. and 5:00 p.m. she needs to lie down and elevate her feet for two hours. She said she had difficulty concentrating for more than forty-five minutes. (Tr. 43-44.) She lived with her parents. (Tr. 44.)

---

[2]Morrison testified at the hearing that she was 5'3" tall and weighed 188 pounds. (Tr. 42.)

Morrison had an unrestricted driver's license, and she drove twice daily to and from work at a distance of five miles each way. (Tr. 45-46.) She was working between nine and fifteen hours weekly as a cosmetologist. (Tr. 46.) She testified that she was able to: brush her own teeth; comb her own hair; dress, bathe, and feed herself; prepare simple meals; do dishes twice weekly; give her dog food and water; walk her dog; clean the kitchen; sweep and vacuum; dust furniture; wash and fold laundry; talk on the telephone for one hour daily; and visit with people outside her home six hours weekly. (Tr. 46-49.) Her daily activities included: sleeping; watching television for approximately thirty minutes every other day; reading for an hour daily; and walking for fifteen minutes two or three times weekly. (Tr. 49-50.)

Morrison stated that she was compliant with her treatment and medications. She had no difficulty gripping or grasping things. She only worked between one and two hours at a time. (Tr. 52.) She stated that she experienced depression on a daily basis, yet she had not been referred to a psychiatrist or psychologist because Prozac "helped out a lot." (Tr. 43.)

**Vocational Expert's Testimony**

The vocational expert ("VE"), Judith Najarian,[3] testified that Morrison's past work as a cosmetologist was classified as light, skilled work. (Tr. 54.) She performed that work for two full years, in 2006 and 2007, at a level of substantial gainful activity. (Tr. 53.) Some of a cosmetologist's skills are transferable to other, similar work. (Tr. 55.) The ALJ asked the VE to assume a hypothetical person of the same age, education, and with the same

---

[3]Ms. Najarian's curriculum vitae is in the record. (Tr. 117.) Her name is misspelled throughout the hearing transcript.

education as Morrison, subject to the following limitations and conditions contained in Dr. Knosp's RFC assessment:

> This person could lift and carry 20 pounds occasionally, 10 pounds frequently, could stand and walk about six hours out of eight with normal breaks, sit about six hours out of eight with normal breaks, unlimited ability to push and pull, can occasionally climb ramps, stairs, ladders, ropes and scaffolds, can occasionally balance, stoop, kneel, crouch and crawl. Should avoid concentrated exposure to extreme heat and cold and concentrated exposure to hazards such as heights and moving machinery, etcetera and the choices are to give you a criterion touchstone, unlimited avoid concentrated exposure. Avoid even moderate exposure and avoid all exposure so we're on the low end.

(Tr. 56.)

The VE testified that this hypothetical person could perform cosmetology work and could also work as a salesperson of wigs and cosmetics or a manicurist. (Tr. 56-57.) Those occupations are available in significant numbers in the regional and national economies. (Tr. 56-60.) However, the VE testified that if the hypothetical person were based on Morrison's hearing testimony, that person could not perform Morrison's past relevant work or any other work. (Tr. 60.)

## THE ALJ'S DECISION

After following the sequential evaluation process set out in 20 C.F.R. §§ 404.1520 and 416.920,[4] the ALJ concluded that Morrison was not disabled in either the disability or the SSI context. (Tr. 21.) Specifically, at step one the ALJ found that Morrison had not performed substantial gainful work activity since her alleged onset date of December 1, 2007. (Tr. 19.) At step two, the ALJ found the following medically determinable

---

[4]Section 404.1520 relates to disability benefits, and identical § 416.920 relates to SSI benefits. For simplicity, in making further references to the social security regulations the Court will only refer to disability regulations.

impairments: mild cervical spondylosis; moderate lumbar scoliosis; history of multiple sclerosis; status post motor vehicle accident and left non-displaced distal radial fracture/left wrist; and morbid obesity. (Tr. 19-20.) At step three, the ALJ found that Morrison's medically determinable impairments, either singly or collectively, did not meet Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings." (Tr. 20.) The ALJ determined that Morrison had the residual functional capacity ("RFC") to: lift and carry up to twenty pounds occasionally and ten pounds frequently; stand, sit and walk for six hours each in an eight-hour workday; and occasionally climb, balance, stoop, kneel, crouch, and crawl. He stated that Morrison must avoid concentrated exposure to extreme cold or heat, unprotected heights, and dangerous moving machinery. (Tr. 20-21.) At step four, the ALJ determined that Morrison did not possess the RFC to perform her past relevant work as a cosmetologist. (Tr. 21-22.) The ALJ concluded that Morrison had skills from her past relevant work that were transferable to other occupations with jobs existing in significant numbers in the community, such as a cosmetics salesperson and a manicurist. (Tr. 22-23.) In summary, the ALJ found that Morrison was not disabled for purposes of disability or SSI. (Tr. 23.) The ALJ found that Morrison met the insured status requirements of the SSA through December 31, 2011. (Tr. 19.)

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Howe v. Astrue,* 499 F.3d 835, 839 (8th Cir. 2007).

"'Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision.'" *Slusser v. Astrue,* 557 F.3d 923, 925 (8th Cir. 2009) (quoting *Gonzales v. Barnhart,* 465 F.3d 890, 894 (8th Cir. 2006)). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Carlson v. Astrue,* 604 F.3d 589, 592 (8th Cir. 2010). As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *Fredrickson v. Barnhart,* 359 F.3d 972, 976 (8th Cir. 2004).

## DISCUSSION

### I. The ALJ's Focus

Morrison argues that the ALJ focused on her periods of remission rather than on the relapsing nature of multiple sclerosis. She argues that the ALJ incorrectly determined that her condition would remain stable and relied only on clinical findings that supported his finding of nondisability.

In considering a case involving multiple sclerosis:

Courts have long recognized that multiple sclerosis is a progressive disease for which there is no cure and which is subject to periods of remission and exacerbation. While multiple sclerosis is not per se disabling, the ALJ in evaluating a claimant with MS must consider "the frequency and duration of the exacerbations, the length of the remissions, and the evidence of any permanent disabilities." Since at least 1984, the Social Security regulations have recognized that "[i]n conditions which are episodic in character, such as multiple sclerosis . . . consideration should be given to frequency and duration of exacerbations, length of remissions, and permanent residuals." 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, § 11.00(D). Thus, "'[w]hen a claimant with multiple sclerosis applies for social security benefits, it is error

14

> to focus on periods of remission from the disease to determine whether the claimant has the ability to engage in substantial gainful employment.'"

*Tyser v. Astrue,* 2010 WL 2541255, at *10 (D. Neb. 2010) (citations omitted).

In applying these principles in deciding *Tyser,* United States Magistrate Judge F.A. Gossett concluded that the ALJ had not considered the progressive nature of Tyser's incurable multiple sclerosis and remanded the case. In that case, however, Tyser's illness was marked by constant fatigue as noted in medical records, and statements of every treating physician regarding his inability to work. Tyser had few instances of remission. *Id.* at **3-5.

In Morrison's case, her medical records reveal a different set of symptoms and what appear to be more periods of remission. The records generally show that Morrison: was not in acute distress; had good cognitive abilities and intact cranial nerves, full strength, good coordination, somewhat diminished reflexes (attributed to her steroid use); and walked without assistive devices. She complained of depression only once and did not ask for a referral to a psychologist or psychiatrist. Mental health treatment was never recommended. The record shows few occasions of significant exacerbation. She experienced flares involving sinus and urinary tract infections. A significant flare was treated with Tysabri injections with excellent results, according to Morrison.

The ALJ considered specifically Morrison's flares as well as her periods of remission:

> While the claimant has had an occasional MS flare up, not long thereafter it was noted her MS was stable. Also, in spite of some subtle progression of white matter changes noted on MRI, the claimant's physical examinations recorded in the medical record generally are normal, showing full motor strength at 5/5, normal gait, no muscle atrophy, *etc.*

(Tr. 22 (citations to the record omitted).)

In summary, the ALJ focused on both periods of relapse as well as remission in evaluating Morrison's case.

## II.     Nurse Practitioner's Opinion

Morrison argues that the ALJ failed to discuss the opinions of her nurse practitioner, Dr. Filipi.  The Court agrees.

While opinions of "acceptable medical sources" such as physicians are required to give opinions regarding the existence of medically determinable impairments, 20 C.F.R. § 404.1513(a) (2011), the opinions of "other sources" such as nurse practitioners "are important and should be evaluated on key issues such as impairment severity and functional effects."  SSR 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006).  Rule 06-03p recognizes that professionals such as nurse practitioners often have close and frequent contact with patients and "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians."  *Id*.  With respect to an ALJ's opinion:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision in hearing cases and in the notice of determination (that is, in the personalized disability notice) at the initial and reconsideration levels, if the determination is less than fully favorable.

*Id.*, at *6.

In deciding *Evans v. Astrue,* No. 4:08CV3266, 2010 WL 1664973 (D. Neb. Apr. 22, 2010), the Honorable Richard G. Kopf was presented with a situation in which the ALJ merely stated that he "'considered opinion evidence in accordance with the requirements of [SSR] . . . 06-03p.'" *Id*. at 10. Judge Kopf stated that it was "not apparent that [the ALJ] gave proper consideration to the various weighting factors listed" in SSR 06-03p. *Id*. Judge Kopf noted that the Commissioner argued a "*post hoc* rationale" for discrediting the nurse practitioner's opinion, referring to inconsistencies in the record. However, Judge Kopf reasoned that he must review what the ALJ actually considered and, because none of the nurse practitioner's treatment notes was even mentioned by the ALJ, he was not able to determine what the ALJ considered. *Id*.

Morrison's case is identical to the situation presented in *Evans*. The ALJ only stated: "I have also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (Tr. 20.) Otherwise, the ALJ did not reference any letter or treatment notes of Dr. Filipi. Dr. Filipi saw Morrison more than any physician or other medical professional, and the lack of any discussion, or even mention, of her treatment and opinions and the reasons why her opinions were rejected is significant. The Court recognizes inconsistencies in the record and even to some extent between Dr. Filipi's treatment notes and her opinion letters. The presence of those inconsistencies provides an additional reason why a discussion of the ALJ's reasons regarding the treatment and opinions of Dr. Filipi, who was Morrison's primary treating professional, is necessary. On remand, the ALJ must specifically address Dr. Filipi's opinions as required by SSR 06-03p.

### III.     Depression

Morrison argues that the ALJ failed to evaluate her depression and determine that her depression was a severe impairment.

The ALJ is required to determine whether an impairment is "severe" at the second step of the sequential evaluation. 20 C.F.R. § 404.1520(a)(4)(ii)(2011). Once a single severe impairment is found, the analysis must proceed. *Id*. In Morrison's case, the ALJ found other severe impairments and continued the analysis. At step four, the ALJ concluded that depression did not cause any work-related limitations. That conclusion is supported by the presence of only one isolated complaint of depression in the record, and Morrison's own statement that Prozac "helped [her depression] a lot."

Also, in evaluating the severity of a mental impairment, the ALJ must first specify the "symptoms, signs, and laboratory findings" that support the existence of a mental impairment. 20 C.F.R. § 404.1520a(b)(1) (2011). In Morrison's case, this was not possible because the record contained essentially no treatment notes regarding depression. The only evidence of depression is that Morrison was taking Prozac, and only during one visit with Dr. Filipi did Morrison complain of depression and ask for an increase in her Prozac. (Tr. 546-47.) As Morrison admitted, she never asked for a referral to a psychologist or psychiatrist because Prozac "helped a lot." No physician, or the nurse practitioner, ever suggested to Morrison that she seek mental health treatment. The record does not support the existence of a mental impairment that would trigger further evaluation, and therefore the ALJ did not fail to further evaluate depression.

**IV.     Past Relevant Work**

This issue was not raised by the parties but must be clarified on remand. The VE clearly testified, in answer to the first hypothetical based on Dr. Knosp's assessment, that Morrison "could do cosmetology work," her recent past relevant work. (Tr. 56.)

However, the ALJ concluded that Morrison was "unable to perform any past relevant work." (Tr. 21.) His few words of explanation contain the following inconsistency:

> Ms. Najarian testified the claimant's past relevant work as a cosmetologist is skilled, light work. The vocational expert testified that an individual with the residual functional capacity of the claimant would be able to perform this job. Accordingly, the claimant is unable to perform past relevant work.

(Tr. 22.)

Therefore, on remand the ALJ must revisit his opinion regarding Morrison's past relevant work as a cosmetologist.

Accordingly,

IT IS ORDERED:

1. The Commissioner's decision is reversed and remanded under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order; and

2. Judgment will be entered in a separate document.

DATED this 7th of March, 2012.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge